**GOVERNMENT EMPLOYEES
INSURANCE COMPANY,
Plaintiff,**

v.

**Alexander DIZOL, Special Administrator of the Estate of Kevin Tate
Dizol, deceased, Defendant.**

**No. CIV. 94–977 ACK.**

United States District Court,
D. Hawaii.

Nov. 30, 2001.

John T. Hassler, Miyagi Nohr & Myhre, Anthony Y K Kim, Stephen K Roy, Honolulu, HI, for plaintiff.

James Ireijo, Cool, CA, for defendant.

***ORDER DENYING DEFENDANT'S MOTION TO DISMISS, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT***

KAY, District Judge.

### BACKGROUND

This insurance coverage case arises out of a one-car accident on September 14, 1991 on the island of Hawaii. Kevin Dizol was a passenger in a van driven by Vernell Adams. Just prior to the accident, Adams was drinking at the Highlands Bar & Grill ("Highlands").

The Court addresses two motions in this Order. First, Alexander Dizol, Special Administrator of the Estate of Kevin Tate Dizol, deceased ("Defendant"), moves to dismiss the complaint of Government Employees Insurance Company ("Plaintiff") and/or for summary judgment. Second, Plaintiff moves for summary judgment.

At the time of the accident, the van Adams drove was insured by Fireman's Fund Insurance Company of Hawaii, Inc. ("Fireman's Fund") with bodily injury liability limits of $35,000 per person. Highlands was also insured by Fireman's Fund. In 1993, Defendant filed suits in Hawaii state court against both Highlands (under a dram shop theory) and Adams's estate. On November 10, 1994, Defendant settled with Highlands and Fireman's Fund for $255,000. The limit of Highlands' policy was $1 million. On that date or sometime soon after, Defendant received from Fireman's Fund $35,000 on behalf of Adams.[1] On April 24, 1995, Defendant dismissed with prejudice his suits against Adams and Highlands. Defendant also received no-fault benefits of $15,000 on February 25, 1992 and underinsured motorist benefits of $35,000 (policy limit) from USAA Insurance Company on December 21, 1994. In total, Defendant has received $340,000. According to an economist retained by Defendant, the deceased's projected loss of earnings is $357,177. No other evidence of damages is before the Court.

On the date of the accident, Harvey Dizol, the deceased's brother, was insured under a policy issued by Plaintiff (the "Policy") which included underinsured motorist ("UIM") coverage of $70,000. The Policy has a "relative resident" clause whereby relatives living in the policyholder's household are insured. *See* Def. Mot. Dis., Ex.

A, at 10. Under "LOSSES WE PAY," the Policy states:

> We will pay damages an *insured* is legally entitled to recover for *bodily injury* caused by accident and arising out of the ownership, maintenance or use of an *underinsured motor vehicle.* However, we will not pay until the total of all bodily injury liability insurance available has been exhausted by payment of judgments or settlements.

*See id.* at 11 (emphasis in original). The Policy also has a "consent-to-settle" clause:

> This coverage does not apply to *bodily injury* to an *insured* if the *insured* or his legal representative has made a settlement or has been awarded a judgment of his claim without our prior written consent.

*Id.* (emphasis in original). It is undisputed that the settlements with Adams and Highlands were made without Plaintiff's prior written consent.

Defendant first made a demand for UIM insurance on August 12, 1994. *See* Pl. Mot. SJ, Ex. B, F, G. Jeffrey A. Todd was assigned to be the claims examiner. *See* Pl. Mot. SJ, Aff. Jeffrey A. Todd ¶¶ 3, 5 ("Todd Aff."). Todd was to investigate, *inter alia*, whether the deceased was a "relative resident" of Harvey Dizol's household. *See id.* ¶ 6. Todd wrote Defendant a letter acknowledging the claim had been made on August 18, 1994.

> Please note that your letter was the *first notice* we have received of this loss. At this time I have requested policy information from the mainland due to the fact that *this loss occurred approximately three years ago.*

---

1. Defendant originally stated that the Adams payment was made on November 10, 1994. However, Defendant's filings for the instant motions state that the $35,000 from Fireman's Fund for Adams was not received until after December 2, 1994, possibly in January of 1995. *See* Def. Supp. Opp. Pl. Mot. SJ, at 1–2.

... Please advise how much coverage is available under the Highland's Bar and Grill policy. In your letter you noted that the trial date has yet to be set. *Please advise what the status is in regards to the suit* and whether all necessary depositions have been taken.

Pl. Mot. SJ., Ex. H (emphasis added). Also on August 18, 1994, Todd discovered from Fireman's Fund representatives that, *inter alia*, suit had been filed against Adams "some years ago" but that the status of the lawsuit was unclear. Fireman's Fund also informed Todd that it had tendered, but Defendant had not then accepted, $35,000 representing a full pay out of benefits for the policy held by Adams. *See* Todd Aff. ¶ 8.

On September 27, 1994, Defendant's present counsel (James Ireijo) told Todd that "DIZOL had settled his claims against ADAMS and HIGHLANDS for the respective sums of $35,000.00 and $255,000.00; (b) HIGHLANDS had liability limits of one million dollars; and (c) DIZOL would be looking to obtain UIM benefits regardless of that settlement." Todd Aff. ¶ 10.[2] Todd also avers that upon learning this conversation with Ireijo, he "immediately called [Plaintiff's former attorney Carleton Reid] (that same day) and sent him the claims file for his review and future handling." *Id.* ¶ 11.

On October 3, 1994, Reid wrote Todd and suggested that he investigate whether Kevin Dizol truly resided with the policyholder. *See* Opp. Pl. Mot. SJ, Ex. B. He also wrote:

It is ... unclear if the Estate of Kevin Dizol has already accepted the entire amount of bodily injury liability coverage available to Vernell Adams.... Mr. Fitzgerald's August 12, 1994 letter seems to suggest that a settlement has already been reached with Mr. Adams .... If there has been a settlement with Vernell Adams, such may be a violation of your policy where you have a right to withhold consent to a settlement where your interests would not be protected. *If a settlement has not yet been reached, you might wish to intervene* in the pending action *or make it clear to the Estate of Kevin Dizol's attorney that you will not consent to any settlement* that releases Mr. Adams for his available policy coverage.

*Id.* (emphasis added). Despite Reid's suggestion, Plaintiff did not move to intervene in the underlying state tort case. According to Ireijo, he did not receive any objection to the pending settlements before late November of 1994.

On November 28, 1994, Reid wrote Ireijo, (1) requesting information about the deceased's status as a "resident relative" and whether he had any other insurance coverage; (2) stating that if there had been a settlement with Adams, it was without the Plaintiff's consent and could mean that there was no UIM coverage available because of the policy violation; and (3) stating:

If and when you wish to settle with Mr. Adams for his available policy limits, please advise me of such and the details surrounding your desire to do so. My suspicion is that you have not yet settled with Mr. Adams because of the "joint tortfeasor act" where you are pursuing the "deep pocket" liquor establishment.

---

**2.** Neither party informed the Court of the September 27th conversation between Ireijo and Todd and therefore the Court was unaware that Plaintiff knew of the (potential) settlements as early as September 27, 1994. *See* 1995 SJ Order, at 11. Plaintiff first brought the conversation to light in the Todd Affidavit. Defendant argues that Plaintiff should have brought the fact to the Court's attention in its earlier motion for summary judgment. Yet, interestingly, Defendant's counsel was one-half of the September 27 conversation and never informed the Court of the factual omission, either.

If my assumption is incorrect, please advise me of such and the status of the Estate's circuit court claims for bodily injury.

Pl. Mot. SJ., Ex. J.

On December 1, 1994, Ireijo telephoned Reid and informed him that Defendant had settled his claim with Highlands for $255,000. This was the first Reid (but not Plaintiff) knew of the settlement. *See* Reply Pl. Mot. SJ, at 2. On December 2, 1994, Ireijo wrote Reid a letter informing him that Defendant had released Highlands and that he planned to settle with Adams shortly. *See* Pl. Mot. SJ., Ex. K.

On December 29, 1994, Plaintiff filed the instant lawsuit under the Declaratory Judgment Act, 28 U.S.C. § 2201–02 (1994) ("DJA"). Plaintiff sought a declaration that Defendant is not entitled to collect under the Policy because he breached the consent-to-settle clause. Alternatively, Plaintiff requested a set off against Defendant's damages of either: 1) the full amount of bodily injury coverage available to Adams and Highlands, or 2) the full amount of payments received by Defendant.

On August 22, 1995, Plaintiff filed a motion for summary judgment. This Court granted the motion after finding that Defendant breached the consent-to-settle clause. *See* Order Granting Plaintiff's Motion for Summary Judgment, at 4, 14 (filed Nov. 9, 1995) ("1995 SJ Order"). The Court rejected Defendant's estoppel/laches/waiver arguments based on Plaintiff's alleged untimely objection to the settlement with Highlands. *Id.* at 10–13.[3] The Court denied Defendant's motion for reconsideration.

Defendant appealed. The Ninth Circuit vacated and remanded the 1995 Summary Judgment order because this Court had not sua sponte determined whether it was "appropriate" to exercise its discretionary jurisdiction under the DJA. *See Government Employees Ins. Co. v. Dizol*, 108 F.3d 999, 1004, 1010, 1012 (9th Cir.1997), *vacated*, 133 F.3d 1220 (9th Cir.1998) ("*GEICO (Panel)*"). This Court had not examined the DJA issue as no parties had raised it.

The panel's opinion was reversed by the Ninth Circuit sitting *en banc*. *See Government Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1222–23 (9th Cir.1998) (en banc) ("*GEICO (En Banc)*"). The en banc court held that "when a district court has constitutional and statutory jurisdiction to hear a case brought pursuant to the [DJA], the district court may entertain the action without sua sponte addressing whether jurisdiction should be declined." *Id.* at 1224. The en banc court vacated the panel opinion and returned control of the case to the panel for resolution of the appeal on the merits. *See id.* at 1227. The panel again vacated this Court's entry of summary judgment. It remanded the case with instructions to reconsider the 1995 Summary Judgment Order in light of the Hawaii Supreme Court's decision in *Taylor v. GEICO*, 90 Hawai'i 302, 978 P.2d 740 (1999).

On May 19, 2000, Defendant filed an amended counterclaim for breach of the implied covenant of good faith and fair dealing.

Plaintiff filed its motion for summary judgment on both its complaint and the amended counterclaim on June 5, 2000.[4]

---

3. At the time of this holding, the Court was uninformed of the September 27, 1994 conversation. *See* footnote 2, *supra.*

4. Plaintiff did not file a separate concise statement of facts, as required by Local Rule 56.1(a) & (c). "When resolving motions for

summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties." L.R. 56.1(f). The Court fines

Defendant filed his opposition August 11, 2000. Plaintiff filed its reply August 31, 2000. Without leave of Court, Defendant filed a supplement to his opposition on September 5, 2000.

Defendant filed his motion to dismiss and/or motion for summary judgment on June 28, 2000.[5] Plaintiff filed its opposition on August 4, 2000. Defendant did not file a reply. The Court held a hearing on the motions on September 11, 2000.

## STANDARD OF REVIEW

### I. MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). The standard for summary adjudication is the same. *See California v. Campbell,* 138 F.3d 772, 780 (9th Cir. 1998). A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims and defenses. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The United States Supreme Court has declared that summary judgment must be granted against a party who fails to demonstrate facts to establish an element essential to his case where that party will bear the burden of proof of that essential element at trial. *See id.* at 322, 106 S.Ct. 2548. "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact [citations omitted], the nonmoving party may not rely on the mere allegations in the pleadings in order to

preclude summary judgment." *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

Rather, Rule 56(e) requires that the nonmoving party set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *See id.* at 630. At least some "significant probative evidence tending to support the complaint" must be produced. *Id.* Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *See British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Insurance Co. of North America,* 815 F.2d 1285, 1289 (9th Cir.1987) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505.

The Ninth Circuit has established that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987). Moreover, the United States Supreme Court has stated that "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

---

Plaintiff $50 for this failure to comply with the local rules.

**5.** Defendant did not file a separate concise statement of facts either. The Court also fines Defendant $50.

Indeed, "if the factual context makes the nonmoving party's claim *implausible*, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Franciscan Ceramics*, 818 F.2d at 1468 (emphasis in original) (citing *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348). Of course, all evidence and inferences to be drawn therefrom must be construed in the light most favorable to the nonmoving party. *See T.W. Elec. Serv.*, 809 F.2d at 630–31.

## II. MOTION TO DISMISS

■■■■ "A party invoking the federal court's jurisdiction has the burden of proving the actual existence of subject matter jurisdiction." *See Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir.1996). On a Rule 12(b)(1) motion, the court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction. *See McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir.1988). "The requirement that the nonmoving party present evidence outside his pleadings in opposition to a motion to dismiss for lack of subject matter jurisdiction is the same as that required under Rule 56(e) that the nonmoving party to a motion for summary judgment must set forth specific facts, beyond his pleadings, to show that a genuine issue of material fact exists." *Trentacosta v. Frontier Pac. Aircraft Indus., Inc.*, 813 F.2d 1553, 1559 (9th Cir.1987); *see also Biotics Research Corp. v. Heckler*, 710 F.2d 1375, 1379 (9th Cir.1983) (noting that the district court may receive evidence to resolve underlying factual disputes in a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction).

■■■■ The district court's dismissal for lack of subject matter jurisdiction is reviewed de novo. *See Seven Resorts, Inc. v. Cantlen*, 57 F.3d 771, 772 (9th Cir.1995). Any factual determinations made by the district court in ruling on the motion to dismiss are reviewed for clear error. *See Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.*, 20 F.3d 987, 990 (9th Cir.1994).

Under Rule 12(b)(6), in determining whether a motion to dismiss for failure to state a claim upon which relief can be granted, this Court must accept as true the plaintiff's allegations contained in the complaint and view them in a light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Wileman Bros. & Elliott, Inc. v. Giannini*, 909 F.2d 332, 334 (9th Cir.1990); *Shah v. County of Los Angeles*, 797 F.2d 743, 745 (9th Cir. 1986). Thus, the complaint must stand unless it appears beyond doubt that the plaintiff has alleged no facts that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). A complaint may be dismissed as a matter of law for two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. *Balistreri*, 901 F.2d at 699; *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533–34 (9th Cir.1984).

In essence, as the Ninth Circuit has stated, "[t]he issue is not whether a plaintiff's success on the merits is likely but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims." *De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir.), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979). The Court must determine whether or not it appears to a certainty under existing law that no relief can be granted under any set of facts that might be proved in support of plaintiffs' claims. *Id.*

A motion under Rule 12(b)(6) should also be granted if an affirmative defense or other bar to relief is apparent from the face of the Complaint, such as lack of jurisdiction or the statute of limitations. 2A J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice,* ¶ 12.07 at 12–68 to 12–69 (2d ed.1991 & supp. 1191–92) (citing *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)) (emphasis added).

## *DISCUSSION*

## I. STANDING

■ The dissent to the en banc decision questioned whether this Court has subject matter jurisdiction over the instant action. *See GEICO (En Banc),* 133 F.3d at 1228–29 (Alarcon, J., dissenting). Although neither party to these motions discussed this issue, the Court will address it sua sponte. *See United States v. Viltrakis,* 108 F.3d 1159, 1160 (9th Cir.1997) ("the jurisdictional issue of standing can be raised at any time, including by the court sua sponte").

The dissent argued that Plaintiff did not carry its burden of showing it met the constitutional minimums for standing outlined in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (requiring that a plaintiff prove, *inter alia,* an injury in fact). Specifically, the dissent argued that Plaintiff "failed to carry its burden of demonstrating that it was threatened with injury because Adams was underinsured," i.e., there was no evidence that the economic loss suffered by Defendant exceeded the

sum of Adams's policy limits and Highlands's policy limits. *Id.* at 1228. The dissent also noted that no Hawaii court had addressed, "whether an insurance company has any liability under [a UIM] policy where a joint tortfeasor's separate insurance policy provides sufficient coverage to pay for the entire loss suffered by the injured party." *Id.* at 1229. The dissent then stated that:

> To exercise our subject matter jurisdiction in this matter, we must assume either [1] that [Highlands's] dram shop insurance policy is not sufficient to pay the Dizol Estate for all of its losses, or even if it is sufficient, [2] a Hawaii court would nevertheless hold GEICO liable under its underinsurance policy.

*Id.* (brackets added).

The Court finds that Plaintiff has carried its burden of showing that it is threatened with injury. Before Plaintiff filed suit, Defendant sought to hold Plaintiff liable under the UIM policy regardless of Highlands's policy limit. *See* Pl. Mot. SJ, Ex. K, at 2 ("it is our position that should this case reach a decision, that your liability begins after $35,000 is 'awarded,' and not after $305,000").[6] Plaintiff's injuries were thus the possibilities that it would have to: a) honor the Policy despite the breach of the consent-to-settle clause, or b) honor the Policy regardless of the fact that a joint tortfeasor carried sufficient insurance to compensate Defendant fully.

As the record reflects, Highlands's insurance policy had a limit of $1 million. This may or may not be sufficient to pay Defendant's losses.[7] Assuming that it is

---

**6.** Defendant was making his first "offset" argument, namely, that Plaintiff could offset the $35,000 received from Adams's estate, but not the $255,000 received from Highlands, nor the $15,000 in no-fault benefits received in 1992, nor the $745,000 forgone in the below policy limits settlement with Highlands. The letter in Exhibit K was written before USAA paid Defendant $35,000 in UIM benefits in

late 1994 and therefore, Defendant's theory on Plaintiff's ability to offset that payment is not clear. The Court addresses offsets in Part III.B, *infra.*

**7.** The evidence before the Court is that Defendant's losses are approximately $360,000. This figure includes wage loss estimates but not pain and suffering. *See* Pl. Mot. SJ, Ex.

sufficient, the dissent nevertheless argues that for Plaintiff to have standing this Court must find that a Hawaii court would still impose UIM liability even though the joint tortfeasor's separate insurance policy provides sufficient coverage to pay for the entire loss. The Court respectfully disagrees. While it is true that the answer to this legal question will determine whether and at what point (after offsets) Plaintiff is *liable* to Defendant or not, it does not follow that a determination of no liability means that Plaintiff lacks *standing*. If that were true, every DJA plaintiff who filed a case claiming that he will be injured if the law is construed a certain way would be found to lack standing if the law is construed in his favor. This is clearly not the law. *See, e.g., Fireman's Fund Ins. Co. v. National Bank of Cooperatives*, 103 F.3d 888, 890–91, 895–96 (9th Cir.1996) (insurance company filed a DJA action seeking a determination of no coverage and Ninth Circuit affirmed district court decision that insurer had no liability to the insured; case not dismissed for lack of standing because insurer had no liability to insured). The majority opinion in the en banc decision said as much when it explained that "a dispute between an insurer and its insureds over the duties imposed by an insurance contract satisfies Article III's case and controversy requirement." *GEICO (En Banc)*, 133 F.3d at 1223 n. 2.

■ Finally, despite the dissent's suggestion to the contrary, the fact that the instant case requires the resolution of novel state law questions does not affect Plaintiff's standing. *See id.* at 1229. The presence of state law questions is a factor to be considered in whether this Court exercises its jurisdiction under the DJA, *see* Part II.A, *infra*, but is irrelevant to the standing question. *See Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. Accordingly, the Court finds that Plaintiff has standing.

K, at 2. The amount of damages is a matter

## II. DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Defendant filed the instant motion to dismiss or for summary judgment arguing: 1) that the Court lacks subject matter jurisdiction, 2) that Plaintiff failed to state a claim upon which relief can be granted, and 3) that Plaintiff failed to timely intervene in the underlying state tort case.

### A. Subject Matter Jurisdiction

Defendant asks the Court to refrain from exercising its jurisdiction under the DJA. The DJA states, in relevant part:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a) (emphasis added).

■ A lawsuit seeking federal declaratory relief must pass constitutional muster by presenting an actual case or controversy and must also fulfill statutory jurisdictional prerequisites. *See GEICO (En Banc)*, 133 F.3d at 1222–23. Additionally, it must be "appropriate" to entertain the action. *See id.* at 1223. "This determination is discretionary, for the [DJA] is deliberately cast in terms of permissive, rather than mandatory, authority." *Id.* (citations omitted). The Court has already found that Plaintiff has standing and it is not disputed that an actual case or controversy is before the Court. Moreover, it is undisputed that diversity jurisdiction exists. *See GEICO (Panel)*, 108 F.3d at 1004 n. 6. The only question, therefore, is whether entertaining the instant case is "appropriate."

for arbitration. *See* Part II.B, *infra*.

■ It is within the discretion of the district court to determine whether it is "appropriate" to grant jurisdiction in a declaratory relief action based in diversity. *See Wilton v. Seven Falls Co.,* 515 U.S. 277, 288–89, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) (district court may use its discretion to stay or dismiss an action seeking a declaratory judgment); *GEICO (En Banc),* 133 F.3d at 1223 (noting the permissive, non-mandatory terms of the DJA). *Wilton* explicitly rejected the idea that a district court could only dismiss such actions in "exceptional circumstances," stating that "[d]istinct features of the [DJA] ... justify a standard vesting district courts with greater discretion in declaratory judgment actions than that permitted under the 'exceptional circumstances' test of *Colorado River.*" *Id.* at 286, 115 S.Ct. 2137.

■ A district court is not required, sua sponte, to address the appropriateness of maintaining jurisdiction over a declaratory relief action. *See GEICO (En Banc),* 133 F.3d at 1224–25. If a party raises the issue, however, the district court must explain its reasoning for either accepting or declining jurisdiction. *See id.* The district court's reasoning should focus on the following factors: 1) avoiding needless determination of state law issues; 2) discouraging litigants from filing declaratory actions as a means of forum shopping, and 3) avoiding duplicative litigation. *See id.* at 1225 (citing *Brillhart v. Excess Ins. Co. of America,* 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942)). Additionally, parallel state proceedings should be considered:

> If there are parallel state proceedings involving the same issues and parties pending at the time the federal declaratory action is filed, there is a presumption that the entire suit should be heard in state court. The pendency of a state court action does not, of itself, require a district court to refuse federal declaratory relief. Nonetheless, federal courts should generally decline to entertain reactive declaratory actions. However, there is no presumption in favor of abstention in declaratory actions generally, nor in insurance coverage cases specifically.

*Id.* (citations and footnotes omitted); *accord Maui Land & Pineapple Co. v. Occidental Chem. Corp.,* 24 F.Supp.2d 1079, 1083 (D.Haw.1998) (Kay, C.J.). Finally, when a DJA claim is joined by other, non-DJA claims, "the district court should not, as a general rule, remand or decline to entertain the claim for declaratory relief." *GEICO (En Banc),* 133 F.3d at 1225–26.

■ Defendant now challenges the Court's exercise of its DJA jurisdiction. Accordingly, the Court will determine if exercising jurisdiction is appropriate.

### 1. Avoiding Needless Determination of State Law

Resolution of the instant case will require determination of novel state law issues—the entire substantive case is governed by state law. This factor therefore weighs towards this Court declining jurisdiction.

### 2. Forum Shopping

The court presumes that no forum shopping occurred, as Defendant has not made such an argument. This factor weighs against declining jurisdiction.

### 3. Avoidance of Duplicative Litigation

While there was a state case pending when this case was filed, it was long ago (April 1995) settled and dismissed. Defendant has not informed the Court of other related litigation and thus, there is no reason to think that this litigation is duplicative. This factor weighs against declining jurisdiction.

#### 4. Presence of Parallel Proceedings

For proceedings to be "parallel" it is not required that all parties or issues involved be the same in each court action. *See Golden Eagle Ins. Co. v. Travelers Cos.*, 103 F.3d 750, 754–55 (9th Cir.1996), *overruled in part on other grounds by GEICO (En Banc)*, 133 F.3d at 1227. "It is enough that the state proceedings arise from the same factual circumstances." *Id.; see also Employers Reinsurance Corp. v. Karussos*, 65 F.3d 796, 799–800 (9th Cir.1995) (abuse of discretion for a district court to retain jurisdiction over an insurer's declaratory judgment coverage action in which only state law questions were posed during the pendency of state proceedings which were overlapping, but not completely identical, there were factual questions between the proceedings, and the insurer was not a party to the state court proceeding); *Maui Land & Pineapple*, 24 F.Supp.2d at 1083 (underlying liability suit in state court between the insured and a third party was parallel to the federal court coverage action between the insured and the insurer).

When the instant case was filed there was a pending state court action by Defendant against Adams and Highlands. That lawsuit was not dismissed until April 24, 1995. Even assuming that the state court suit and the instant suit were "parallel," this factor does not weigh in favor of declining jurisdiction. Plaintiff learned on December 1–2, 1994 that settlement had been consummated with Highlands and that it was imminent with Adams.[8] Thus, although the state court action was still pending, by the time Plaintiff filed suit on December 29, 2000, the "parallel" suit was basically complete. By the time a motion for summary judgment was filed in this case (August 22, 1995), the state court case had been over for four months. Moreover, as of this juncture, the "parallel" suit has been dismissed for over five years. The Court will not decline jurisdiction now because five years ago there was a parallel suit. This factor weighs against declining jurisdiction.

#### 5. Presence of Joined Actions

Defendant recently filed a counterclaim for breach of the implied covenant of fair dealing. Thus, although Defendant is the party seeking dismissal, its actions create the situation in which the *GEICO (En Banc)* court advised that "the district court should not, as a general rule, remand or decline to entertain the claim for declaratory relief." *GEICO (En Banc)*, 133 F.3d at 1225. This factor would therefore weigh in favor of retaining jurisdiction, except that Defendant offers to dismiss his claim in order to help the Court decide the instant motion in its favor. Accordingly, the Court finds this factor neither weighs for nor against the exercise of jurisdiction.

#### 6. Conclusion

The Court finds that the application of these factors counsels for retention of jurisdiction. The only factor weighing in favor of declining jurisdiction is the fact that state law issues will be before the Court. This is not unusual, as this Court routinely decides state law issues via its diversity jurisdiction. Moreover, it does not outweigh the fact that there is no evidence of forum shopping, no risk of duplicative litigation, no current (or even recent) parallel proceedings, and there are non-DJA counterclaims pending. Furthermore, it would be a waste of judicial resources to decline jurisdiction after six years have passed. Accordingly, Defendant's motion to dismiss

---

**8.** Plaintiff also knew through Jeffrey Todd of this potential settlement by September 27, 1994. *See* Todd Aff. ¶ 10.

for lack of subject matter jurisdiction is DENIED.

## B. Failure to State a Claim

 Defendant argues that Plaintiff's offset argument fails to state a claim for which relief may be granted. Specifically, Defendant argues that the issue of offsets may be reached only after the parties go to arbitration on the amount of damages. The Policy's arbitration clause, however, does not support Defendant's argument. The clause states:

> If any insured making claim under this policy and we do not agree that he is legally entitled to recover damages under this coverage from the owner or operator of an underinsured motor vehicle because of bodily injury to the insured, or do not agree as to the amount payable, either party may request arbitration.

*See* Def. Mot. Dis., Ex. A, at 12. Thus, arbitration may be invoked if Plaintiff and Defendant disagree on one of two issues: (1) whether Defendant is entitled to recover damages from the underinsured motorist (i.e., Adams), or (2) the amount owed in damages. This is not a general arbitration clause for all disputes. Indeed, a second clause in the Policy reiterates that the arbitrators "will then hear and determine *only* the question or questions of legal liability and/or damages that are in dispute, *and no other issues.*" *Id.* (emphasis added). Hawaii case law supports this reading. *See National Fire Ins. Co. v. Reynolds,* 77 Hawai'i 490, 889 P.2d 67 (1995). Faced with a similar arbitration clause, the court noted that, "most courts hold that arbitration is generally limited to issues of the offending motorist's fault or liability to the covered person and the amount of damages resulting from the accident, *leaving issues relating to policy coverage to the courts.*" *Id.* at 70 (emphasis added). The *National Fire* court then held that,

> [U]nder the standard arbitration clause in underinsured motorist provision, arbitration on the question 'of whether insured was "legally entitled to recover damages" is *limited to determination of offending motorist's fault and his or her resulting liability to the person covered under the policy,* and *does not include ascertainment of whether UIM coverage applies* under any particular circumstance.

*Id.* at 71 (emphasis added).

 The instant dispute concerns Plaintiff's obligation to provide coverage in light of Defendant's settlements with Adams and Highlands. That issue is appropriately before this Court, not an arbitrator. *See id.* If the Court decides that Plaintiff must provide coverage, it must also decide the amount of Plaintiff's liability which will be "offset," if at all, by the awards Defendant has already received. There is no dispute about Adams's fault and his resulting liability to Defendant. *See* Opp. Def. Mot. Dis., 6. Moreover, to the extent that Defendant's damages are yet undecided, Plaintiff's entitlement to offset these damages is a different matter that is appropriately before this Court, and not an arbitrator. Nothing in the Policy dictates that damages must be decided before the legality of certain offsets can be determined. Accordingly, the Court finds that Defendant's argument that Plaintiff cannot receive relief from this Court, because it should have gone to arbitration first, is without merit. Defendant's motion to dismiss on this basis is DENIED.

## C. Failure to Timely Intervene

Defendant next argues that summary judgment should be granted to it based on Plaintiff's failure to timely intervene. Defendant argues that Plaintiff knew about Defendant's UIM claim by August 17, 1994 and also of the underlying state court tort actions against Adams and Highlands.

Defendant also argues that Plaintiff knew of the settlements with Highlands and Adams by September 27, 1994.[9] Defendant argues that it was improper for Plaintiff to wait until December 29, 1994 to file this action and that instead, Plaintiff should have intervened in the pending state court action and stopped Defendant from settling his claims. Defendant contends that "[Plaintiff] should be barred from now complaining because it was the lack of filing a timely intervention to protect it's [sic] own alleged interest that caused it's [sic] own harm." Def. Mot. Dis., at 11.

Plaintiff argues that it should not have intervened because even as of late November/early December of 1994, it was still investigating Defendant's right to coverage. Specifically, Plaintiff contends that it was still investigating the issue of whether the decedent had "relative resident" status.

 Defendant's motion for summary judgment is DENIED. Defendant cites no legal authority in support of his position that Plaintiff's DJA action should be dismissed solely because Plaintiff breached some alleged duty to intervene in the underlying state court case. As explained above, the existence of an underlying state court case is a factor in the Court's analysis of whether it should exercise its juris-diction under the DJA. Additionally, the "timeliness" and appropriateness of Plaintiff's intervention (or lack thereof) is also something to be considered in Defendant's claim for bad faith denial of insurance benefits claim. See Part III.C, infra. Finally, when considering whether Plaintiff's subrogation rights have been prejudiced, see Part III.A.4, infra, the Court will consider whether Plaintiff exercised "reasonable diligence to protect its subrogation interest." See Grain Dealers Mut. Ins. Co. v. Pacific Ins. Co., 70 Haw. 211, 768 P.2d 226, 230 (1989); see also State Farm Fire & Cas. Co. v. Pacific Rent-All, Inc., 90 Hawai'i 315, 978 P.2d 753, 771 (1999) (approving of the Grain Dealers equitable requirement of diligence in protecting subrogation interests). This inquiry could include whether timely intervention would have protected any lost subrogation rights. However, Defendant does not present and the Court has not found any authority[10] stating that Plaintiff's non-intervention alone is a sufficient legal basis to grant Defendant summary judgment in Plaintiff's DJA action about coverage and offset questions. Instead, the Court finds that it is a factor to be examined within the aforementioned larger analyses. Defendant's motion for summary judgment based solely on Plaintiff's "failure to timely intervene" is DENIED.[11]

---

9. Defendant does not offer any factual support for these statements, referring broadly to "the files and records herein." His motion for summary judgment should be denied on this basis alone. See footnote 4, supra; L.R. 56.1(f). Nevertheless, the Court finds that these facts are supported by the August 12, 1994 letter from Defendant to Plaintiff, see Pl. Mot. SJ, Ex. B, and the Todd Affidavit.

10. The only case Defendant cites is Ing v. Acceptance Ins. Co., 76 Hawai'i 266, 874 P.2d 1091 (1994). Ing explains Hawaii law on permissive intervention. One consideration in the permissive intervention analysis is whether the application was timely. See id. at 1096. Defendant does not ask the Court to examine whether intervention should be allowed, but instead, to examine the effect of Plaintiff's non-intervention. Ing is inapposite.

11. Moreover, even assuming that Defendant was "untimely," Defendant neither argued nor demonstrated that a "timely" application to intervene would have been granted. In other words, Defendant errs by arguing as if timeliness is the only issue in intervention. It is not. See Ing, 874 P.2d at 1096. For example, Plaintiff's right to intervene is questionable because Plaintiff did not know if Kevin Dizol was a "resident relative" as of late November of 1994. Thus, this Court determining that Plaintiff was "timely" or "un-

### III. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

On June 28, 1999, the Ninth Circuit panel vacated the 1995 summary judgment Order and remanded the case "for reconsideration in light of *Taylor v. GEICO*." [12] Plaintiff filed the instant motion for summary judgment "to enable the District Court to reconsider its prior Order." Pl. Mot. SJ, at 8. The first issue is whether Defendant lost his coverage by settling with the tortfeasors without Plaintiff's consent. The second issue, which need only be reached if coverage is found, is whether Plaintiff may offset its UIM liability with amounts from a joint tortfeasor's separate insurance policy. Third, Plaintiff seeks summary judgment of Defendant's "bad faith" counterclaim.

### A. Coverage

#### 1. Subrogation

 Subrogation is "the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt." *Taylor*, 978 P.2d at 748. "The general rule is that an insurer, on paying a loss, is subrogated in a corresponding amount to the insured's right of action against any other person responsible for the loss." 6A Appleman, *Insurance Law and Practice*, § 4051 (1972). " '[S]ubrogation plays an important role in insurance law. . . . When subrogation[ ] runs its course, the legally responsible third party reimburses the insurer for having paid the debt which the party owed the insured.' " *State Farm*, 978 P.2d at 766 (citing Robert H. Jerry, II, *Understanding Insurance Law* §§ 96[a] and 96[b], at 600 (2nd ed.1996)) (some brackets added, some in original).

timely" compels no conclusion about whether Plaintiff should have or would have been able to intervene.

The *Taylor* court explained subrogation in the UIM context as follows:

> In the UIM context, *once the UIM carrier has paid benefits to the injured insured, the UIM carrier succeeds to the insured's rights against the tortfeasor.* The UIM carrier may then prosecute the insured's claim against the tortfeasor to the extent of the UIM carrier's payments to the insured. Thus, where a tortfeasor has sufficient assets to offset his or her lack of insurance, the UIM carrier may recoup its payments to the insured victim.

*Taylor*, 978 P.2d at 748 (quotation marks and citations omitted, emphasis added).

Subrogation has been described as "stepping into" the shoes of another. *See State Farm*, 978 P.2d at 767. The *State Farm* court explained that,

> when an insurer brings an action against a tortfeasor based upon its subrogation rights, *the insurer's rights flow from the insured's rights.* The subrogated insurer, known as the "subrogee," can be subrogated to and enforce only such rights as the insured, known as the "subrogor," has against the party whose wrong caused the loss. In a subrogation suit, a tortfeasor may assert against the insurer any defense which the tortfeasor could have asserted against the insured.

*Id.* (emphasis added) (citing 4 R. Long, *The Law of Liability Insurance*, § 23.03[2], at 23–13 to 23–14 (1998)). The court then reiterated the "general rule" that "an insured may affect its insurer's subrogation rights because they are derivative, i.e., the insurer's subrogation rights rest upon the viability of the insured's claim against the tortfeasor." *Id.* The court also explained that generally, if an

**12.** *Taylor v. GIECO* was decided subsequent to the 1995 summary judgment Order.

insured releases a tortfeasor from liability before the insurer pays the loss under its policy, subrogation rights are lost. *See id.* The court next held, however, that this general rule does not apply (and thus, subrogation rights are not lost) when "the insurer proves (1) that the tortfeasor had actual or constructive knowledge of the insurer's subrogation right of reimbursement or that the tortfeasor and insured colluded to destroy the insurer's subrogation right *and* (2) that the insurer's subrogation right of reimbursement is actually prejudiced by the insured's release of the tortfeasor." *Id.* at 768.[13] The court concluded that, "Where the insurer's subrogation right clashes with the tortfeasor's contractual release right, the insurer's subrogation right will prevail if the tortfeasor acted inequitably." *Id.* at 771.

## 2. The 1995 Summary Judgment Order

In its 1995 motion for summary judgment, Plaintiff argued that Defendant's failure to obtain prior written consent violated the "consent-to-settle" clause of the Policy. Plaintiff also argued that the result of this breach was the destruction of any subrogation rights Plaintiff would have had against Adams and Highlands, and that this action should prevent Defendant from recovering under the Policy. It is undisputed that Adams and Highlands were "joint tortfeasors." Under Hawaii tort law, joint tortfeasors are jointly and severally liable for a victim's injuries. *See* H.R.S. § 663–11. Accordingly, through Plaintiff's subrogation rights, it would have been able to pursue Highlands for the total amount of any award or judgment so long as Highlands was found partially responsible for Defendant's damages. Under the general rules of subrogation, *see supra,* a settlement which released Adams and Highlands from further liability, however, would destroy Plaintiff's subrogation rights.

The Court granted Plaintiff summary judgment after finding that Defendant failed to obtain consent prior to settling with Adams and Highlands and that Plaintiff's subrogation rights were destroyed thereby. *See* 1995 SJ Order, at 9, 14.[14] The Court rejected Defendant's argument that the consent-to-settle clause was void as against public policy. *See id.* at 13–14.

## 3. *Taylor v. GEICO*

Subsequent to this Court's ruling on the 1995 summary judgment motion, the Hawaii appellate courts addressed for the first time the validity and application of consent-to-settle clauses. *See Taylor* 978 P.2d at 746. In *Taylor,* a nearly (if not) identical UIM policy (by the same insurer) was in issue. Taylor's insurance with GEICO included UIM coverage. After a collision with a vehicle driven by Mary McKaig, Taylor incurred damages estimated at a half million dollars and sued McKaig. McKaig offered to settle for $33,000, two thousand dollars under her $35,000 policy limit. Taylor informed GEICO of the offer. GEICO refused to approve the settlement because it did not exhaust the limits of McKaig's bodily injury policy. Despite GEICO's stance, Taylor settled with McKaig and executed a

---

**13.** Although the Hawaii Supreme Court stated that this holding applied in "the context of fire and casualty insurance," the Court sees no reason that it would not apply to other types of insurance as a subrogation principle. *See id.* at 768, 770, 874 P.2d 1091.

**14.** The Court upheld its conclusion in its Order Denying Defendant's Motion for Recon-

sideration (filed Nov. 30, 1995). In his motion for reconsideration, Defendant conceded that the settlement agreement with Highlands "probably" contained terms under which "Fireman's Fund could defend against a potential claim for subrogation made by Plaintiff." *See id.,* at 2.

joint tortfeasor release, releasing McKaig and her insurers from liability in exchange for the $33,000. Taylor then made a claim for UIM benefits. GEICO refused to pay. *See id.* at 742–43.

■ The *Taylor* Court began its analysis by noting that nothing in the legislative history of the UIM statute (H.R.S. § 431:10C–301) "reveal[s] an express legislative intent to permit or prohibit the use of 'consent-to-settle' ... clauses to preclude recovery by insureds who present claims that would otherwise be compensable pursuant to the provisions of their UIM coverage." *Id.* at 746. Next, the court noted that consent-to-settle provisions "have been widely litigated outside of Hawaii, and a majority of jurisdictions has upheld such provisions in the UIM context." *Id.* The court held that

> [W]e are unable to hold that consent-to-settle clauses, per se, contravene the intent of H.R.S. § 431:10C301(b)(4). The UIM statute does not mandate that coverage be unqualified.... In our view, consent-to-settle provisions do not necessarily violate either the letter or the spirit of [the UIM statute].

*Id.* at 747. The *Taylor* court cautioned, however, that a consent-to-settle clause does not give an insurer "carte blanche" to deny coverage. "[W]e hold that a UIM carrier's grounds for denying UIM benefits under a consent-to-settle provision in a UIM policy must be reasonable, in good faith, and within the bounds of the intent underlying HRS § 431:10C–301(b)(4)." *Id.*

*Taylor* then held that "protection of the UIM carrier's subrogation rights would be a reasonable basis for a refusal to consent to settlement." *Id.* at 748. The court observed that "[c]onsent-to-settle provisions perform the crucial function of protecting a UIM carrier's potential subrogation interests." *Id.* It also held that preserving the UIM carrier's subrogation rights is good public policy because it facilitates modestly priced UIM coverage by leaving UIM carriers in a position to recoup some of the UIM payments. *See id.* The court noted, "In fact, we find it difficult to imagine any basis for a UIM carrier to refuse to consent to a settlement apart from its need to protect its subrogation interest." *Id.* at 752 n. 11. For example, the court held that it would be an unreasonable basis to withhold consent to settlement because the proposed settlement would not exhaust the tortfeasor's policy limits. *See id.* at 752.[15]

■ A UIM insurer may not deny consent to settle, however, merely by making an unsupported assertion that it is doing so to protect its subrogation rights. Instead, the insurer must demonstrate prejudice by the insured's failure to obtain consent before settling with the tortfeasor. *See id.* at 748. "In order to demonstrate prejudice, the UIM carrier's investigation should address factors such as the amount of assets held by the tortfeasor, the likelihood of recovery via subrogation, and the expenses and risks of litigating the insured's cause of action." *Id.* (quotation marks and citations omitted).

### 4. Applying *Taylor* to the Instant Case

■ It is undisputed that Defendant did not obtain Plaintiff's written consent before settling with Adams and Highlands. Defendant has not argued that Plaintiff implicitly consented[16] to his settlement

---

**15.** In fact, the Court held that exhaustion clauses are void as against public policy. *Taylor,* 978 P.2d at 750. The Court discusses exhaustion clauses more fully in Part III.B, *infra.*

**16.** Nor did Defendant make such an argument in his opposition to Plaintiff's first motion for summary judgment. Defendant made only waiver and laches arguments.

with Adams or Highlands. Plaintiff argues that it should be allowed to enforce the consent-to-settle provision (and deny coverage based on its breach) because the breach caused it to lose its subrogation rights. This is a reasonable basis to invoke the consent-to-settle clause *if* Defendant can show prejudice from the loss. *See Taylor*, 978 P.2d at 748–49. Thus, the Court first examines whether Plaintiff's subrogation rights have been lost. Second, it examines whether Plaintiff is prejudiced by the loss, if any.

### a. Loss of Plaintiff's Subrogation Rights

 It is undisputed that Defendant released Adams, Highlands, and Fireman's Fund from liability before Plaintiff paid Defendant's claim. *See* Pl. Mot. SJ, Ex. K. As explained above, generally, if an insured releases a tortfeasor from liability before the insurer pays the loss under its policy, subrogation rights are lost. *See State Farm*, 978 P.2d at 767. The *State Farm* court created an exception to this general rule, however, holding that subrogation rights are not lost where "the insurer proves (1) that the tortfeasor had actual or constructive knowledge of the insurer's subrogation right of reimbursement or that the tortfeasor and insured colluded to destroy the insurer's subrogation right *and* (2) that the insurer's subrogation right of reimbursement is actually prejudiced by the insured's release of the tortfeasor." *Id.* at 768 (emphasis added).[17]

### i. Actual or Constructive Knowledge

Defendant argues that Fireman's Fund, Highlands' insurer, had actual and/or constructive knowledge of Plaintiff's subrogation rights [18] when Fireman's Fund settled with Defendant. *See* Opp. Pl. Mot. SJ, at 19–20. Evidence before the Court supports such a finding. First, Defendant brought forth evidence that Ireijo spoke with Fireman's Fund about the UIM claim with Plaintiff. "I have a distinct recollection of discussing the DIZOL UIM claims with GEICO and USAA, respectively, with the Fireman's Fund Insurance Company's claims adjuster for HIGHLAND's [sic] prior to actual settlement with the same, although I cannot recall giving written notice of the subject UIM claims to Fireman's Fund." *See* Ireijo Decl. ¶ 8, attached to Opp. Pl. Mot SJ. Second, the Todd affidavit, presented by Plaintiff, makes clear that Plaintiff's employees had spoken with Fireman's Fund while evaluating Defendant's UIM claims before the release was signed. *See* Todd Aff. ¶ 8 ("affiant secured the following information from Howard Oshiro, the Fireman's Fund representative assigned to handle [Defendant's] bodily injury claim [on August 18, 1994]"). On the other hand, Plaintiff did not present any evidence to show that Fireman's Fund did not have actual or constructive knowledge of Plaintiff's subrogation rights.

The Court finds that there is no genuine issue of fact whether Fireman's Fund had knowledge of Plaintiff's subrogation rights.[19] For the *State Farm* exception to

---

**17.** Although the Court was only instructed to reconsider its holding in light of *Taylor v. GEICO*, the *State Farm* opinion (issued subsequent to *Taylor*) relates to the issues in *Taylor*.

**18.** Even though Plaintiff had not yet paid the UIM claim, and therefore Plaintiff's subrogation rights had not yet vested, the *State Farm* exception clearly applies to situations when the insured settles with the tortfeasor pre-payment. *See State Farm*, 978 P.2d at 767.

Accordingly, when this Order speaks of the subrogation rights of which Fireman's Fund had knowledge, it means the "potential" subrogation rights and does not mean to imply that such rights had already vested.

**19.** *See Grain Dealers*, 768 P.2d at 228–29 (in deciding whether a UIM insurer exercised reasonable diligence in protecting its subrogation rights, giving notice of the claim to the

not apply, Plaintiff must show that Fireman's Fund did not have actual or constructive knowledge of Plaintiff's subrogation claim when it signed the release. As all the evidence is exactly to the contrary, the Court finds that Fireman's Fund had knowledge of Plaintiff's subrogation rights when it signed the release with Defendant.

### ii. Is the Subrogation Right Actually Prejudiced (*State Farm* Prejudice Inquiry)

■■■ The second prong of the *State Farm* exception for inequitable behavior requires that the UIM insurer's subrogation rights be actually prejudiced by the release of the tortfeasor.[20] "If the insurer could not have recovered, it is not prejudiced . . . ." *State Farm*, 978 P.2d at 768 (citing 4 R. Long, *The Law of Liability Insurance*, § 23.04[1], at 23–41 to 23–42 (1998)). The Court concludes that Plaintiff was prejudiced by the release. Adams and Highlands were joint tortfeasors. While it appears that Adams's estate would not have been a source of any funds, Highlands's $1 million insurance policy clearly would have been. Defendant has not argued nor presented any evidence that Plaintiff could not have recouped its payments from Highlands if Defendant

had not released Highlands as part of the settlement.[21]

■■■ Moreover, Defendant's "waiver" argument does not compel a different conclusion. Defendant argues that to the extent Plaintiff's subrogation rights are lost, it is because Plaintiff waived these rights by not exercising "reasonable diligence." *See Grain Dealers*, 768 P.2d at 230; *see also State Farm*, 978 P.2d at 771. In other words, Defendant argues that Plaintiff is not prejudiced by the release because Plaintiff had already lost its subrogation rights through its own actions. The Court disagrees. "Reasonable diligence" means that the insurer which claims a subrogation right "must give timely and reasonable notice of its claim to both the tortfeasor and the tortfeasor's insurer." *See Grain Dealers*, 768 P.2d at 230. *Grain Dealers* then held that it was "reasonable notice" when a UIM insurer informed a tortfeasor's insurer (but not the tortfeasor) of its subrogation claim. *See id.* at 227, 230. As the Court noted in the preceding section, Plaintiff (and also Defendant) gave Fireman's Fund notice of Plaintiff's subrogation claims as early as August 18, 1994 and Fireman's Fund thereby had knowledge of Plaintiff's subrogation rights. Defendant's argument that

tortfeasor's insurer, and not to tortfeasor, held sufficient).

**20.** It is important to keep distinct the two prejudice inquiries. First, under *Taylor,* in order for a party to enforce a consent-to-settle clause based upon the loss of its subrogation rights, a party must show prejudice from the loss of those rights. *See Taylor,* 978 P.2d at 749. Second, under *State Farm,* in order for a party to show that the release of a tortfeasor did not cause its subrogation rights to be lost, the party must prove that the tortfeasor had actual or constructive knowledge of the insurer's subrogation right *and* that its subrogation rights were prejudiced by the release because it otherwise could have recovered from the tortfeasor. *See State Farm,* 978 P.2d at 768.

**21.** It does not appear that the statute of limitations would bar an action by Plaintiff (as Defendant's subrogee) against Fireman's Fund. A suit arising out of a motor vehicle accident may be brought in tort within "[t]wo years after the date of the last payment of motor vehicle insurance or optional additional benefits." H.R.S. § 431:10C–315(b)(2). UIM insurance constitutes "optional additional benefits." *See Allstate Ins. Co. v. Wolcott,* 847 F.Supp. 787, 790 (D.Haw.1994); *Honbo v. Hawaiian Ins. & Guaranty Co.,* 86 Hawai'i 373, 949 P.2d 213, 215–16 (1997). Thus, Plaintiff will have two years from the date it pays Defendant benefits under the Policy, if ever, in which to bring suit against Fireman's Fund.

Plaintiff lost its subrogation rights by failing to use "reasonable diligence" is not well taken. Accordingly, there being no genuine issue of fact in dispute, the Court finds that Plaintiff was prejudiced by the release of Highlands.

### iii. Conclusion on Loss of Subrogation Rights

To find that Plaintiff's subrogation rights were lost, the Court must conclude that the *State Farm* exception for inequitable behavior by a tortfeasor does not apply. The *State Farm* exception applies if: 1) Fireman's Fund had actual or constructive knowledge of Plaintiff's subrogation claim when it signed the release, and 2) Plaintiff's subrogation rights were actually prejudiced by the release because it otherwise could have recovered from the tortfeasor. The Court has found that there is no genuine issue of fact that both of these factors are satisfied[22] and therefore, the *State Farm* exception applies. Accordingly, despite the fact that Defendant released Highlands prior to Plaintiff paying Defendant's UIM claim, the Court concludes as a matter of law that Plaintiff's subrogation rights were not lost.

### b. Prejudice (*Taylor* Prejudice Inquiry)

The second prong of the *Taylor* test to enforce a consent-to-settle clause requires a party to show prejudice from the loss of its subrogation rights. In light of the

holding that Plaintiff's subrogation rights were not lost, there was no prejudice.[23]

### 5. Conclusion

A consent-to-settle clause is only enforceable if a court finds that the settlements caused the insurer to lose its subrogation rights and that the insurer was prejudiced thereby. *See Taylor*, 978 P.2d at 748–49. The Court finds that Plaintiff's subrogation rights were not lost by Defendant's settlements with Highlands and Adams. Plaintiff has not set forth any other reason to enforce the consent-to-settle provision of the Policy and therefore, Plaintiff's motion for summary judgment on the issue of coverage is DENIED.

### B. Offsets

Because the Court denies Plaintiff's motion for summary judgment on the issue of coverage, it now examines the amount by which Defendant's UIM claim should be offset, if any. Plaintiff argues that it is entitled to an "offset" of the $1 million policy limits of the Highlands dram shop insurance, or, alternatively, $255,000 representing the amount actually received in settlement from Highlands. Put another way, Plaintiff argues that its liability to pay is not triggered unless Defendant has damages in excess of these offsets. Defendant argues that neither amount may be used to offset Plaintiff's obligation.[24] The amount Plaintiff must pay Defendant is

---

**22.** *See* footnote 23, *infra*.

**23.** The Court recognizes the apparent incongruity of its statements in Parts III.A.4.ii and III.A.4.iii that Plaintiff was prejudiced by the release of Highlands (because Plaintiff otherwise could have recovered from the tortfeasor) and the instant statement that there was no prejudice to Plaintiff by the release. This incongruity is attributable to the interplay between *Taylor* and *State Farm*. Under *State Farm*, subrogation rights are not lost if, *inter alia*, an insurer's subrogation rights are preju-

diced by a settlement with a tortfeasor. A conclusion that the *State Farm* test is satisfied means that subrogation rights are not lost—if there is no loss, there can be no prejudice when doing the *Taylor* analysis. Accordingly, the two conclusions are not inconsistent.

**24.** The parties have not briefed and it is therefore unclear what their positions are on the appropriateness of offsetting some or all of the $85,000 received by Defendant from other automobile policies. Accordingly, the Court does not address this issue.

contingent on the amount of "underinsurance," i.e., the difference between Defendant's damages (to be decided by an arbitrator) and payments already received (and, potentially, those forgone) which can be used to "offset" its liability.[25] The question in the instant case is whether amounts received and/or forgone in reaching a below-policy-limit settlement with an underinsured motorist's dram shop joint tortfeasor without a UIM carrier's consent can be used to offset the carrier's liability to its insured. The Court will answer this question by separating it into two analyses: 1) may amounts *received* from a dram shop joint tortfeasor without a UIM carrier's consent be used to offset the carrier's liability to its insured, and 2) may amounts *forgone* in a below limits settlement with a dram shop joint tortfeasor without a UIM carrier's consent also be used to offset the carrier's liability? No Hawaii court has yet addressed this specific issue. Because the Court must apply substantive Hawaii law in this diversity action, the Court must use its best judgment in predicting how the Hawaii Supreme Court would decide this issue. *See, e.g., Allstate,* 847 F.Supp. at 789. After a careful consideration of Hawaii law, the Court answers both questions in the affirmative and holds that Plaintiff is entitled to a $1 million offset.

### 1. Payments Received From Joint Tortfeasors Without the UIM Carrier's Consent Are Properly Used to Offset the Carrier's Liability

 The first question is whether amounts *received* from a dram shop joint tortfeasor without the UIM carrier's consent may be used to offset the carrier's

liability to its insured. A recent Hawaii appellate decision makes it clear that the answer is yes. The Intermediate Court of Appeals held that an insurer may offset amounts received from a joint tortfeasor when calculating the amount of UM benefits owed to the insured. *See AIG Hawaii Ins. Co. v. Rutledge,* 87 Hawai'i 337, 955 P.2d 1069, 1070 (1998)[26]; *accord Prudential Property & Cas. Ins. Co. v. Dumont,* 136 N.H. 569, 618 A.2d 839, 840 (1992) (holding that a UIM carrier may, in calculating its payment under a UIM policy, set off the amounts recovered from tortfeasors other than the underinsured motorist to the extent that those amounts represent double recovery); *Bauter v. Hanover Ins. Co.,* 247 N.J.Super. 94, 588 A.2d 870, 873 (1991) (a UIM carrier may set off amounts received from joint tortfeasor dram shop's insurance); *but see American Universal Ins. Co. v. DelGreco,* 205 Conn. 178, 530 A.2d 171, 173–74, 179–82 (1987) (UIM carrier's liability may only be offset with payments received from other automobile policies and not dram shop's insurance).

In *Rutledge,* two family members were injured when an unidentified driver caused them to swerve their car out of its path and into a boulder. They received uninsured motorist ("UM") benefits pursuant to their policy with AIG. The Rutledges then sued the City and County of Honolulu ("City") alleging negligence in the design of the roadway and the maintenance of the shoulder. After an arbitrator apportioned liability between the Rutledges, the unidentified driver, and the City, the City paid the Rutledges damages which fully compensated them for their damages.

---

**25.** Under the Policy, "In return for no-fault benefits provided and underinsured motorist benefits provided, the amounts under this coverage will be reduced by all amounts (a) paid by or for all persons or organizations liable for the injury." Pl. Mot. SJ, Ex. E, at 10.

**26.** The Court notes that the dissent in the *GEICO (En Banc)* decision pointed out that this issue had not been resolved in Hawaii law. This was correct when that decision was issued in January of 1998. *Rutledge* was issued in March of 1998.

*See id.* at 1072, 1080. AIG subsequently demanded reimbursement of the UM benefits it had paid. The *Rutledge* court began by noting that the purposes of the UM statute were "to promote protection ... for persons who are injured by uninsured motorists who cannot pay for personal injuries caused by motor vehicle accidents" and "to place those insured in the same position they would have occupied had the tortfeasor carried liability insurance." *Id.* at 1074–75. The court held that when an insured receives an UM benefit from his insurer, and the insured then receives a tort recovery from a joint tortfeasor which fully compensates him, the insured must reimburse the UM benefits paid to the extent there is duplicative compensation. *Id.* at 1070, 1078. The court clarified that UM payments need not be returned simply because a joint tortfeasor paid some damages—reimbursement is owed only if the joint tortfeasor's payments fully compensate the victim and double recovery would occur without reimbursement. *See id.* at 1078. Under this scheme, the goal of UM insurance—that the insured be compensated as well as if the uninsured driver had been insured—is achieved without the insured recovering more than if the uninsured driver had been insured. Accordingly, the court held that because the payments by the joint tortfeasor City placed the Rutledges in the same position as they would have occupied had the unidentified driver been identified and fully insured, the UM benefits paid by AIG should be reimbursed. *See id.* at 1080–81 ("We discern no reason, on the facts of this case, why reimbursement should be disallowed on the basis that a joint tortfeasor paid the uninsured motorist's portion of damages").

The Court finds that *Rutledge* is both analogous to the instant case and decisive on this issue. The Court reaches this decision despite the fact that it appears at first blush that there are a number of distinctions between *Rutledge* and the instant case. Upon a closer look it is apparent that these distinctions are of little or no consequence. For example, *Rutledge* deals with UM benefits and the instant case deals with UIM benefits. This does not affect *Rutledge*'s persuasiveness as authority for a UIM question because the Hawaii courts have treated UM and UIM cases as nearly interchangeable. *See Caberto v. National Union Fire Ins. Co.,* 77 Hawai'i 39, 881 P.2d 526, 529 (1994) (stating that the issues concerning UIM insurance are governed by the same rules that apply to UM cases); *Kang v. State Farm Mut. Auto. Ins. Co.,* 72 Haw. 251, 815 P.2d 1020, 1022 (1991) (same). Moreover, the purposes behind the UIM statute are nearly, if not completely, identical to those behind the UM statute. *See Kang,* 815 P.2d at 1022.

> Underinsured motorist coverage was designed to protect against loss resulting from bodily injury or death suffered by any person legally entitled to recover damages from an owner or operator of an underinsured motor vehicle. The stated purpose of the statute was that it be consistent with the overall intent of the no-fault law to provide speedy and adequate protection to persons injured in motor vehicle accidents at the least possible cost. When the statute was recodified in 1988, both the House and Senate agreed that under this bill, underinsured motorist coverage would be treated in the same manner that uninsured motorist coverage is presently treated, i.e. as a means of protection, through voluntary insurance, for persons who are injured by motorists whose liability policies are inadequate to pay for personal injuries.

*See Kang,* 815 P.2d at 1022 (citations and quotations omitted).

Next, the Court does not find it significant that *Rutledge* deals with a request for reimbursement of paid benefits and Plaintiff seeks an offset of unpaid benefits. Offsets and reimbursements are two sides of the proverbial same coin. *See Rutledge,* 955 P.2d at 1078 n. 16 (stating that an offset applied to UIM benefits before payment "is analogous to AIG's request for reimbursement for the UM benefits it paid").[27]

Nor does the Court find it an important distinction that the instant joint tortfeasor is a dram shop and *Rutledge* dealt with a joint tortfeasor other than a dram shop. The Court finds that the holding in *Rutledge* is certainly broad enough to encompass payments by a dram shop. *Rutledge* simply holds that when a joint tortfeasor pays an insured for damages caused jointly by itself and the uninsured motorist, the UM carrier may use such payments to offset its liability once the insured has been fully compensated. In *Rutledge,* the joint tortfeasor was the City, who paid damages for the role its negligent road design and maintenance played in the accident. Absolutely nothing in *Rutledge* suggests, and the Court can discern no policy reason why, the type of insurance or the identity or occupation of the joint tortfeasor is significant. Moreover, Defendant has not suggested any compelling reason why payments by the joint tortfeasor City should be treated any differently from a joint tortfeasor which is a bar. Indeed, the fact that the joint tortfeasor in *Rutledge* was the City makes apparent that

Hawaii courts do not follow a rule whereby only payments by certain types of joint tortfeasors may be offset. Compare, for example, the more strict approach of Connecticut in *DelGreco.* The Connecticut court held that a UIM carrier's liability could only be offset with payments received from other automobile liability policies. *See DelGreco,* 530 A.2d at 173–74, 179–82. *DelGreco* specifically refused to allow an offset of payments made by a dram shop insurer. Applying *DelGreco* to the instant case would mean that Plaintiff could only offset money Plaintiff received from the other automobile policies—such a result is obviously at odds with Hawaii law. In *Rutledge,* the City was sued for negligence in road design and maintenance. After being found liable, it clearly did not pay the Rutledges damages out of an automobile insurance policy; nevertheless, the Intermediate Court of Appeals allowed an offset. *DelGreco* is irreconcilable with *Rutledge.* By comparison, the Court finds that the approach taken by a New Jersey court in *Bauter* is consistent with *Rutledge.* In *Bauter,* an offset was given based upon joint tortfeasor payments which did not come from automobile liability policies, but instead were made by a dram shop joint tortfeasor. *See* 588 A.2d at 873. Accordingly, following both *Rutledge* and *Bauter,* this Court finds that a UIM carrier may offset payments by joint tortfeasors, including joint tortfeasors who are not covered by automobile liability policies, such as dram shops.[28]

---

27. Defendant's suggestion that *Rutledge* is distinguishable because in that case the insurance company promptly paid and in the instant case Plaintiff sought a declaration of its liability is meritless. Whether Plaintiff was meanspirited and unkind (or, for that matter, thorough and careful) is irrelevant to the offset question and is instead properly considered in Defendant's bad faith claim, discussed *infra* in Part III.C.

28. The Court notes that the Rutledges accepted money from the City without AIG's consent. *Rutledge* holds that a UIM carrier may offset payments accepted from joint tortfeasors without its consent. As *Taylor* makes clear, consent-to-settle clauses exist to protect subrogation rights. Consent is therefore not an issue in *Rutledge* because Rutledge involves offsets, not subrogation rights.

The other Hawaii cases which Defendant cites do not convince the Court that it should come to a different conclusion. First, Defendant cites *Caberto*, wherein the Hawaii Supreme Court held that a UIM carrier may not offset its obligation to pay UIM benefits by the amount of workers' compensation benefits an insured receives. *Caberto*, 881 P.2d at 529. *Rutledge*, issued after *Caberto*, is clearly more analogous and is the controlling case. There are simply different approaches to offsetting UIM benefits in Hawaii: joint tortfeasor payments are offset and workers' compensation payments are not. The instant case squarely involves a joint tortfeasor and thus, *Rutledge* governs.

Defendant also cites *Sol v. AIG Haw. Ins. Co.*, 76 Hawai'i 304, 875 P.2d 921 (1994). *Sol* is off point. The *Sol* court concluded that when paying UM benefits, a UM insurer could not offset the no-fault benefits it had paid to the insured. *Sol*, 875 P.2d at 925–26; *see also Caberto*, 881 P.2d at 528–29 (applying *Sol* to UIM insurance). As Plaintiff is not trying to offset no-fault benefits, *Sol* is inapplicable to the instant case.[29]

For the foregoing reasons, the Court finds *Rutledge* controlling authority. The Court holds that under Hawaii law, a UIM insurer may offset amounts received from a dram shop joint tortfeasor without the insurer's consent when calculating the amount of UIM benefits owed to its insured.[30] Similar to the court in *Rutledge*, this Court discerns no reason why an offset should be disallowed on the basis that a joint tortfeasor paid the uninsured motorist's portion of damages. *See Rutledge*, 955 P.2d at 1080–81. Accordingly, Plaintiff may offset the amounts received ($255,000) from Adams's joint tortfeasor (Highlands) when calculating its liability to Defendant.

### 2. Amounts Forgone in a Below Limits Settlement with a Joint Tortfeasor Without a UIM Carrier's Consent May Be Used to Offset the Carrier's Liability

 The next inquiry is whether amounts *forgone* in a below-policy-limits settlement with a joint tortfeasor without a UIM carrier's consent may also be used to offset the carrier's liability. Although no Hawaii appellate court has squarely answered this question, *Taylor* dealt with a similar issue and is instructive. The *Taylor* court analyzed an "exhaustion clause" identical to one found in the Policy.[31] *Taylor* held such clauses to be void as against public policy. The court also held, however, that amounts *forgone* in below-policy-limit settlements with a tortfeasor are properly used to offset UIM carrier liability. *See Taylor*, 978 P.2d at 750–52 (victim settled for $33,000 instead of limits of $35,000 policy); *see* discussion in Part III.

---

**29.** *See* footnote 24, *supra.*

**30.** Moreover, the Court disagrees with Defendant's argument that Rutledge is distinguishable because it turns on whether the insured was "fully compensated" and, if Plaintiff is allowed to offset payments by Highlands, Defendant will not be fully compensated. Certainly, the holding of *Rutledge* is that there is no right to reimbursement of paid UM benefits unless (and only to the extent that) the insured received double recovery. However, the Court does not agree that no offset is allowed if Defendant will not be fully compensated. As the Court explains in the next sec-

tion, such a holding would ignore Hawaii law that when a UIM insured makes a below policy limits settlement the insured forgoes the "gap" between the settlement amount and the policy limits. *See Taylor*, 978 P.2d at 751–52; Part III.B.2, *infra*. Obviously, under *Taylor*, the insured risks not being "fully compensated."

**31.** The Policy's exhaustion clause states that Plaintiff "will not pay [UIM benefits] until the total of all bodily injury liability insurance available has been exhausted by payment of judgments or settlements." *See* Mot. SJ, Ex. E, at 10.

A.3, *supra*. *Taylor* explained that exhaustion clauses are against public policy, "because the victim is denied the perfectly reasonable choice of saving months, if not years, of delay, trial preparation expense, and all the ensuing wear and tear by simply accepting the [below limit settlement] offer." *Id.* at 751 (brackets added) (citing *Longworth v. Van Houten*, 223 N.J.Super. 174, 538 A.2d 414, 423 (1988)). *Taylor* then held that enforcement of an exhaustion clause is an insufficient reason to either deny consent to settle or to deny coverage (based upon the breach of a consent-to-settle clause). Nevertheless, the court made clear that the insured may not settle for less than the tortfeasor's policy limits and then fill the "gap" in her damages with her UIM coverage.

> *By settling for less than policy limits, the UIM insured agrees to forego [sic] compensation for the difference between the settlement amount and the tortfeasor's liability policy limits.* The UIM carrier will not be responsible for covering that "gap" as a component of its obligation to compensate its insured for injury and damage exceeding the tortfeasor's policy limits.

*Id.* at 752 (citations omitted and emphasis added); *accord Longworth*, 538 A.2d at 423 (holding that as a condition of making the UIM claim after accepting settlement for less than policy limits, the insured forgoes "the difference between the tortfeasor's policy limit and the tortfeasor's insurer's offer"); *Schmidt v. Clothier*, 338 N.W.2d 256, 261 (Minn.1983) ("the insured cannot obtain a below-limit settlement from the tortfeasor and then recoup the 'gap' from the underinsurance carrier"). The *Taylor* court justified this approach as, "further[ing] the purpose of the UIM statute by providing the insured with a quick recovery, while at the same time *protecting the statutory right of the UIM carrier to be contractually liable to indemnify its insured for his or her injuries*

*only for the amount in excess of the tortfeasor's liability coverage.*" *Taylor*, 978 P.2d at 751 (emphasis added).

The ruling of *Taylor* is unambiguous. Had Defendant reached a below policy limits settlement with Adams, *Taylor* would clearly dictate that Plaintiff would not have to fill in the resulting "gap" with UIM benefits simply to make Defendant whole. The question is whether *Taylor* should be extended to below policy limits settlements with joint tortfeasors which were made without the UIM carrier's consent. Although the Hawaii Supreme Court has not answered this question directly, this Court concludes that the only logical extension of the *Taylor* and *Rutledge* decisions dictates that the answer be in the affirmative. The holding of *Rutledge* is that the UM/UIM carrier's liability should be offset in the amount of either 1) payments from the uninsured/underinsured driver and/or 2) payments from a joint tortfeasor. In other words, when considering offsets, *Rutledge* treats payments received from a joint tortfeasor identically. This makes sense as joint tortfeasors are jointly and severally liable for victims' damages. Defendant does not present, nor does the Court find, any reason why payments received should be treated differently from payments forgone when the insured settles without the insurer's consent. Moreover, *Taylor* is rooted in the policy that a UIM carrier has a statutory right to be contractually liable to indemnify its insured *only* for the amount *in excess* of the tortfeasor's liability coverage. Nothing in *Taylor* suggests that this logic only applies to cases with one tortfeasor. Finally, the Court finds that only this approach is consistent with the definition of "underinsured motor vehicle." A vehicle is not underinsured if the victim's damages exceed the sum of *settlements* consented to with tortfeasors—a vehicle is underinsured if the victim's damages exceed the "sum of the limits" of applicable

insurance. *See* H.R.S. § 431:10C–103; *see also Schmidt*, 338 N.W.2d at 261 (explaining that UIM insurance exists for situations when the *limits* of the tortfeasor's liability insurance is inadequate and *not* for situations when "damages are uncompensated because the insured has chosen to settle with the tortfeasor for less than the liability limits").

Defendant's citation to *Karasawa v. TIG Ins. Co.*, 88 Hawai'i 77, 961 P.2d 1171 (1998) does not compel a different conclusion. In *Karasawa*, an uninsured motorist ("phantom driver") caused an accident involving Karasawa and two known, insured drivers. Karasawa sued the phantom driver and the known drivers; an arbitrator found the phantom driver and the known drivers jointly and severally liable and allocated responsibility amongst them. Karasawa settled and released the two known drivers after they each paid their apportioned amount of damages. The insurance policies of the two known drivers were high enough to pay Karasawa his full amount of damages. Karasawa then sought payment from TIG, his UM insurer, for the portion of his damages caused by the phantom driver. TIG refused to pay, arguing that the other drivers were jointly and severally liable and therefore Karasawa should have recovered his full damages from them and could not get payment from the UM policy. The Hawaii Intermediate Court of Appeals rejected TIG's argument, holding that when making a claim against a UM carrier, a party injured by multiple tortfeasors including an uninsured driver need not exhaust the insurance policies of the joint tortfeasors before making a claim against his or her UM carrier for the portion of the damages attributable to the uninsured driver. *Karasawa*, 961 P.2d at 1177–78.

Defendant appears to argue that *Karasawa* stands for the principle that a UM insured does not forgo the "gap" when making below policy limits settlements with joint tortfeasors and, therefore, this Court should not extend *Taylor* to joint tortfeasors.[32] The Court finds, however, that *Karasawa* does not compel a conclusion that *Taylor* is limited to the one tortfeasor scenario and *Karasawa* controls the joint tortfeasor scenario. *Rutledge* makes clear that payments from joint tortfeasors should be treated similarly to payments from a lone tortfeasor, i.e., both can offset a UIM carrier's liability. To the extent that *Karasawa* and *Taylor* do treat the payments differently, it can be attributed to the order in which the cases were issued and what arguments were discussed and analyzed by the courts. *Karasawa* did not address the question whether an insured forgoes the "gap" when making a below policy limits settlement with joint tortfeasors—*Karasawa* never even discusses the issue. This Court will not infer from *Karasawa*'s silence that it would disagree with the *Taylor* ruling. Moreover, the fact that *Karasawa* was silent on the issue is not surprising considering that *Taylor*, the first Hawaii decision to hold that an insured "forgoes the gap," was issued almost one year *after Karasawa*. It is also not remarkable considering that the issue that triggered the discussion of forgoing the gap in *Taylor* was an exhaustion clause—no such clause was in effect in *Karasawa*. In short, *Karasawa* does not consider all of the issues relevant to the instant case.[33]

**32.** *Karasawa* noted that if the sum of the payments from the joint tortfeasors and the UM insurer equalled more than the insured's damages, the UM carrier is entitled to reimbursement. *See id.* at 1178 n. 5 (citing *Rutledge*, 955 P.2d at 1070).

**33.** The Court notes that *Taylor* does not cite *Karasawa* in its discussion on below policy limits settlements with tortfeasors. To the extent that *Karasawa* is inconsistent with *Taylor*, the Court notes that *Taylor* is a decision of the Hawaii Supreme Court that is more recent than the Intermediate Court of Appeals's

Accordingly, the Court finds that it is distinguishable and creates no reason for the Court to not extend *Taylor* to below policy limits settlements with joint tortfeasors.

 For all the above reasons, the Court holds that under Hawaii law, amounts forgone in below policy limits settlements with joint tortfeasors without the UIM carrier's consent are properly used to offset the carrier's liability. Plaintiff may offset the amount forgone ($745,000) from Adams's joint tortfeasor (Highlands) when calculating its liability to Defendant.

### 3. Conclusion

Because the Court finds that Plaintiff is entitled to offset both the payments received and forgone from Highlands, Plaintiff's motion for summary judgment on this issue is GRANTED. Plaintiff is entitled to a $1,000,000 offset against Defendant's damages. Put another way, Plaintiff's obligation to pay UIM benefits will not "kick-in" until and unless Defendant proves damages exceeding at least $1,000,000.[34] Thus, if Defendant believes he can prove damages in excess of $1,000,000, he should pursue arbitration on this issue.

### C. Defendant's "Bad Faith" Counterclaim

Plaintiff also asks the Court to grant it summary judgment on Defendant's counterclaim for breach of the implied covenant of good faith and fair dealing. *See* Am. Counterclaim (filed May 19, 2000). The counterclaim alleges that Plaintiff acted in tortious breach of the implied covenant of good faith and fair dealing by its failure to pay the $70,000 UIM policy benefits, failure to proceed to arbitration, failure to properly investigate the merits of Defendant's underlying tort claims against Adams or Highlands, failure to intervene in the underlying tort case, improper use of the "excuse" that Defendant violated the consent-to-settle clause, wrongfully pursuing its offset theory, and unreasonably delaying the provision of its contractually bound benefits. The Court construes this as a claim for bad faith denial of insurance benefits. *See Baird v. State Farm Mut. Auto. Ins. Co.*, 11 F.Supp.2d 1204, 1207 (D.Haw.1998) (Kay, C.J.) (discussing the Hawaii tort of "bad faith denial of insurance benefits" and construing a similar claim as stating such).[35]

---

decision in *Karasawa*. Additionally, *Karasawa* does not address offsets and below policy limits settlements with tortfeasors in the UIM context.

**34.** Again, the Court notes that additional offsets may apply but are not the topic of this Order. *See* footnote 24, *supra*.

**35.** Until recently, this Court would have also construed a claim such as the Amended Counterclaim as stating a cause of action for "tortious breach of contract," a cause of action which sounds in contract but provides for compensatory tort damages. *See Baird*, 11 F.Supp.2d at 1207 (construing a claim against an insurer for "failure to provide UIM benefits voluntarily," "unreasonable delay of payment," and "express and/or implied breach of insurance contract" as a claim for,

*inter alia*, tortious breach of contract). However, the Hawaii Supreme Court recently abolished the cause of action, holding, "[W]e decline to recognize the [tortious breach of contract] rule any longer." *Francis v. Lee Enterprises, Inc.*, 89 Hawai'i 234, 971 P.2d 707, 712, 717 (1999) (explaining that the cause of action unnecessarily blurred the distinction between, and undermined the discrete theories of recovery relevant to, tort and contract law). The Hawaii Supreme Court was careful to point out, however, that its decision in *Francis* "does not affect this court's prior decisions recognizing the tort of bad faith in the first-party insurance context." *Francis*, 971 P.2d at 710–11 (noting that when the *Best Place* court recognized the tort of bad faith in the first-party insurance context, it was careful to distinguish claims for tortious breach of contract).

### 1. Bad Faith Denial of Insurance Benefits

 In 1996, the Hawaii Supreme Court adopted a cause of action for bad faith denial of insurance benefits. *See Best Place, Inc. v. Penn America Ins. Co.*, 82 Hawai'i 120, 920 P.2d 334 (1996); *Baird*, 11 F.Supp.2d at 1207 (recognizing adoption of cause of action). In *Best Place*, the Hawaii Supreme Court noted that "[e]very contract imposes upon each party a duty of good faith and fair dealing." *Id.* at 338 (change in original) (quoting Restatement (Second) Contracts § 205 (1979)). It then considered the question of whether a breach of this duty gives rise to a bad faith cause of action and answered this question in the affirmative. The *Best Place* court held,

> [T]here is a legal duty, implied in a first- and third-party insurance contract, that the insurer must act in good faith in dealing with its insured, and a breach of that duty of good faith gives rise to an independent tort cause of action. The breach of the express covenant to pay claims, however, is not the sine qua non for an action for breach of the implied covenant of good faith and fair dealing. The implied covenant is breached, whether the carrier pays the claim or not, when its conduct damages the very protection or security which the insured sought to gain by buying insurance.

*Id.* at 346 (citations and quotation marks omitted).[36] The Hawaii Supreme Court expressly noted that the tort of bad faith "is not a tortious breach of contract, but rather" a separate and distinct wrong which arises from the "breach of a duty imposed as a consequence of the relationship established by" the insurance policy. *Id.* at 345. In fact, an insurer who ultimately pays the claim at issue may be held liable for bad faith in the event of unreasonable delay. *Id.* at 347. The court then articulated the standard for a bad faith claim in the insurance context as follows:

> [T]he insured need not show a conscious awareness of wrongdoing or unjustifiable conduct, nor an evil motive or intent to harm the insured. An unreasonable delay in payment of benefits will warrant recovery for compensatory damages under the Gruenberg test. However, conduct based on an interpretation of the insurance contract that is reasonable does not constitute bad faith. In addition, an erroneous decision not to pay a claim for benefits due under a policy does not by itself justify an award of compensatory damages. Rather the decision not to pay a claim must be in "bad faith."

*Id.* at 347 (citations omitted). Although *Best Place* was the first Hawaii case to *explicitly* approve of the bad faith cause of action, earlier Hawaii cases *implicitly* recognized that an insurer may be liable for bad faith under appropriate circumstances. *See id.* at 339. For example, in *Colonial Penn Insurance Co. v. First Insurance Co. of Hawaii, Ltd.*, the Hawaii Supreme Court held that there was no bad faith denial of benefits when the insurer denied payment of benefits based on an unsettled question of law. *See* 71 Haw. 42, 780 P.2d 1112, 1114 (1989); *Best Place*, 920 P.2d at 339.

 The *Best Place* analysis focuses on the reasonableness of the insurer's actions. *Tran v. State Farm Mut. Auto.*

---

**36.** The Hawaii Supreme Court based its decision upon the test articulated and adopted by the California Supreme Court in *Gruenberg v.* *Aetna Insurance Company*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032, 1040 (1973).

*Ins. Co.,* 999 F.Supp. 1369, 1372 (D.Haw. 1998). While an analysis of what is reasonable is ordinarily a question for the jury, *see id.,* the Court finds that in the instant case, it is able to rule as a matter of law that Plaintiff did not use bad faith in handling Defendant's claim. First, the Court holds as a matter of law that there was no "bad faith" in Plaintiff's: 1) refusal to pay Defendant the $70,000 UIM benefit, 2) invocation of the violation of the consent-to-settle clause "excuse," 3) pursuit of the offset theory, or 4) "unreasonable delay" in providing benefits. "[C]onduct based on an interpretation of the insurance contract that is reasonable does not constitute bad faith." *Best Place,* 920 P.2d at 347. All of this "conduct" is based on Plaintiff's interpretation of the contract to mean that there was no coverage or, alternatively, that if there was coverage, an offset exceeding Plaintiff's damages applied. While the Court answered the coverage issue in Defendant's favor, Plaintiff's interpretation that Defendant lost coverage by his failure to obtain prior consent to settle was reasonable. This is obviously the case considering that Plaintiff's position was reached before *Taylor* and *State Farm* were issued. Moreover, the Court holds herein that Plaintiff's theory of $1,000,000 in applicable offsets was proper. It follows from the Court's decision that Plaintiff's conduct was based upon a reasonable interpretation of the insurance contract by Plaintiff that payment was not owed because such a large offset applied. Furthermore, under *Colonial Penn,* there is no bad faith when an insurer denies payment of benefits based on an unsettled question of law. The validity of the consent-to-settle provision was an unsettled question of Hawaii law at the time demand for payment was made and remained unsettled until *Taylor,* which upheld such

clauses. Similarly, the offset question decided by the Court herein was unsettled law until the issuance of this Order. Plaintiff promptly filed a declaratory judgment action to resolve these unsettled questions. The Court finds that no bad faith has been shown on these asserted bases and therefore, imposition of summary judgment for Plaintiff on this claim is appropriate.

■ Next, for the same reasons discussed in the Court's analysis of Defendant's Motion to Dismiss, there was no bad faith in Plaintiff's refusal to proceed to arbitration. Under a reasonable interpretation of the Policy and Hawaii case law (*see National Fire Ins. Co. v. Reynolds,* 77 Hawai'i 490, 889 P.2d 67 (1995)) coverage is not an issue for arbitration. Instead, that issue was pending before this Court until the issuance of the instant Order. There can be no bad faith in a refusal to go to arbitration when the bedrock issue of coverage is in dispute and that dispute is clearly not arbitrable. Moreover, even if arbitration was arguably permissible before issuance of this Order, Defendant fails to demonstrate facts to establish elements essential to his case, as is required at the summary judgment stage. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. While Defendant complains in his brief about Plaintiff's failure to arbitrate, Defendant presents no facts demonstrating that requests for arbitration were made, that such requests were refused, or that such refusals were made in bad faith. "Legal memoranda ... are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment." *See British Airways,* 585 F.2d at 952. A vague reference to arbitration was made in Defendant's counsel's December 2, 1994 letter to Plaintiff's coun-

sel, but this could hardly be called a demand. *See* Mot. SJ, Ex. K, at 3. Accordingly, both because the bedrock coverage dispute was non-arbitrable and Defendant failed to present facts showing that there was any bad faith failure to proceed to arbitration, the Court finds that summary judgment for Plaintiff on this claim is warranted.

Defendant also bases the claim on Plaintiff's alleged failure to properly investigate the merits of Defendant's underlying tort claims against Adams or Highlands. Defendant fails to show that there is a genuine issue of material fact that would preclude summary judgment on this issue. Defendant certainly argues that Plaintiff failed to properly investigate, *see, e.g.,* Opp. Mot. SJ at 25, 27, but offers no facts to show that it could meet its burden at trial of proving this claim or to even explain his theory. This Court will not let Defendant survive a summary judgment motion without presenting any factual support for his claims. Accordingly, summary judgment on this claim is appropriate.[37]

■ Finally, Defendant asserts bad faith in Plaintiff's failure to intervene in the underlying tort case. Defendant presented evidence that Plaintiff knew as of September 27, 1994 that Defendant had settled with the tortfeasors. *See* Opp. Mot. SJ, Ex. A. There is also evidence that Plaintiff received advice from its legal counsel on October 3, 1994 that it should consider intervening or otherwise making clear to Defendant that settlement could endanger further coverage. Finally, there is evidence that Plaintiff did nothing affirmative to stop court approval of the settlement until November 28, 1994, when it wrote Defendant's counsel a letter warning him not to settle without first obtaining consent. By this time, payment by Highlands had already occurred. *See* Mot. SJ, Ex. K. In the November 28, 1994 letter, however, Plaintiff explains that it was still researching questions regarding coverage (namely, Kevin Dizol's residence) and that these outstanding questions prevented it from concluding Defendant had a valid claim.

Defendant has presented no authority, nor has the Court found any authority, for the idea that an insurer has a "duty to intervene" in settlements between the insured and the tortfeasor. Of course, if the insurer is on notice of a potential settlement and does nothing to prevent it, it risks losing its subrogation rights through its lack of diligence. Hawaii law imposes a clear duty on insurers to exercise reasonable diligence in protecting their subrogation rights; failure to do so may mean that the insurer adversely affects its own subrogation rights. *See State Farm,* 978 P.2d at 771; *Grain Dealers,* 768 P.2d at 230.[38] Whether or not Plaintiff's failure to intervene means that it lost its subrogation rights through its own actions, however, proves nothing about whether Plaintiff acted in bad faith when it did not intervene. If there were reasonable explanations for Plaintiff's actions, there is no bad faith based solely on the fact of non-intervention. Plaintiff moved for summary judgment on this issue and explained that it did

---

**37.** It is not clear if Defendant also asserts bad faith in Plaintiff's failure to investigate whether or not Kevin Dizol was indeed a "resident relative." The same woeful lack of evidentiary support would foreclose this argument, as well. In fact, the evidence shows Plaintiff was seeking information on Kevin Dizol's residency.

**38.** The Court found above that there is no genuine issue of material fact that Plaintiff did exercise reasonable diligence.

not intervene because it was uncertain whether the decedent lived with the policyholder. Until that issue was decided, Plaintiff could not be certain that Defendant had coverage—nor would it have a right to intervene before basic coverage questions were resolved. Defendant has presented no countervailing evidence to show that this decision was made in bad faith. All Defendant presents to the Court is the fact of notice (of the settlements) and the fact of non-intervention. This is insufficient factual support for his claims to survive a summary judgment motion. Accordingly, the Court finds that summary judgment on this claim is appropriate. Because the Court finds that all of the bases for Defendant's bad faith counterclaim could not withstand the summary judgment motion, Plaintiff's motion for summary judgment on this issue is GRANTED.

## *CONCLUSION*

For the foregoing reasons, Defendant's Motion to Dismiss and for Summary Judgment is DENIED, Defendant's Motion for Summary Judgment is DENIED, and Plaintiff's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED.